UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD GLASSMAN,

       Plaintiff,

  -against-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE DEPARTMENT, POLICE OFFICER ISMAEL VILLALBA, POLICE OFFICER SALVADOR ROSARIO, POLICE OFFICER RAMON GUILLEN, POLICE OFFICER CARLOS JIMENEZ, POLICE OFFICERS JOHN DOE NUMBERS 1–3, unknown and intended to be other New York City police officers involved in the occurrence herein, NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE, and DILENIA SOLARES DURAN,

       Defendants.

10 Civ. 2468 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

  This action arises out of Donald Glassman's arrest, prosecution, and ultimate acquittal on charges of rape, assault, and criminal contempt, all stemming from his short-lived marriage to Dilena Solares Duran. Having been exonerated in state court, Glassman now seeks recompense from four New York Police Department officers and the City of New York for violations of his constitutional rights. Specifically, Glassman asserts claims pursuant to 42 U.S.C. § 1983 against the officers for false arrest, malicious prosecution, and failure to intervene, as well as a host of state law torts, and attempts to hold the City of New York liable as well pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City and NYPD officers now move for summary judgment dismissing Glassman's section 1983 claims and ask that this Court decline to exercise

1

supplemental jurisdiction over his state law claims for relief. For the reasons set forth below, defendants' motion is granted.

I. **BACKGROUND**

   A. **Factual Background**

In late 2004, plaintiff Donald Glassman, then a divorcé in his mid-thirties, met Dilenia Solares Duran, a resident of the Dominican Republic, on the dating website Amigos.com. (Pl.'s 56.1 ¶¶ 1–2.)[1] Glassman met Duran in person in January 2005, and over the next eighteen months worked to secure a visa to allow her to travel to the United States as his fiancée. (Testimony of Glassman at his second criminal trial ("Glassman Test.") at 677–80, annexed to plaintiff's 56.1 Statement as Exhibit A; Pl.'s Opp'n 56.1 ¶ 8.) Duran arrived in New York in late June 2006, and the two married a little more than a month later. (Pl.'s 56.1 ¶¶ 3–4.)

Whatever honeymoon period Glassman and Duran may have enjoyed was short-lived. Glassman claims that his new wife quickly became verbally and physically abusive, sexually demanding, drank to excess, and did not make genuine efforts to learn English. (*Id.* ¶ 5; Glassman Test. at 682–83, 695–96.) For her part, Duran alleges that Glassman was verbally abusive, controlling, and even threatened to "cancel" her immigration application process.[2] (Defs.' 56.1 ¶ 5.) Moreover, one evening, after Duran declined to engage in sexual intercourse, Glassman allegedly shoved her out of bed and had sex with her against her will as she wept. (*Id.* ¶¶ 6–7; *id.*, Ex. B at 161–67.) Duran did not report this incident until several weeks

---

[1]  Plaintiff's Local Rule 56.1 statement contains two sets of consecutively numbered paragraphs. The Court shall refer to the numbered paragraphs on pages 1–13 as "Pl.'s 56.1," and the numbered paragraphs beginning on page 13 as "Pl.'s Opp'n 56.1."

[2]  Glassman alleges that at some point during their marriage, Duran became aware of the U Visa program—a nonimmigrant visa set aside for victims of certain crimes who assist law enforcement. (Pl.'s Opp'n 56.1 ¶ 10; *see* Violence Against Women Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533–37.)

later and Glassman vigorously disputes her account. (Pl.'s 56.1 ¶ 7; Pl.'s Opp'n 56.1 ¶ 12.)

Duran's and Glassman's marital conflict spilled out into the open on the morning of October 31, 2006. Glassman claims he told Duran the night before that their marriage was over and asked her to leave the apartment. (Pl.'s 56.1 ¶ 8.) The two argued the next morning, during which, Duran alleges, Glassman shoved her out of bed and slammed a door into her forehead. (Defs.' 56.1 ¶ 8.) Duran fled the apartment and wandered the neighborhood, eventually ending up at Lincoln Center, which was nearby. (*Id.* ¶¶ 9, 12, 14.) Duran approached Panagis Dalmaneras, a Lincoln Center security guard, believing he was an NYPD officer. (*Id.* ¶ 14.) Although Dalmaneras could not understand Duran, who was speaking Spanish, he and another security guard escorted her to the central security office inside the Lincoln Center complex. (*Id.* ¶¶ 14–16.) There she met Spanish-speaking security guard Johnny Dejesus and told him that Glassman had assaulted her that morning. (*Id.* ¶¶ 17–20.)

A short time later, NYPD officer Carlos Jimenez arrived at Lincoln Center in response to a 911 call placed by Lincoln Center personnel. (Pl.'s 56.1 ¶¶ 22, 24; *id.*, Ex. E.) Jimenez found Duran sitting on a chair crying and agitated. (Defs.' 56.1 ¶ 25.) She repeated her account that Glassman had physically harmed her and thrown her out of their apartment. (*Id.* ¶ 27.) She also told Jimenez that Glassman had forced himself on her sexually. (*Id.*) Jimenez and his partner took Duran to the 20th Precinct where she swore out a statement to NYPD Officer Ismael Villalba, the precinct's domestic violence officer. (*Id.* ¶¶ 29, 34.) In her statement, she recounted Glassman's alleged threats, emotional and physical abuse, and stated that he forced her to have sex with him. (Pl.'s 56.1, Ex. P at 3.) The NYPD officers did not question Duran in greater detail about her sexual relationship with Glassman, her immigration status, when she married Glassman, or how they had met. (Pl.'s Opp'n 56.1 ¶¶ 18–21.)

The parties dispute whether Duran was visibly injured when she spoke to the NYPD officers. At Glassman's first criminal trial, three NYPD officers testified that they observed a large discolored lump on Duran's forehead. (Defs.' 56.1, Ex. F at 61, Ex. H at 82, Ex. I at 97.) Officer Villalba

3

repeated this testimony during his deposition in this action.  (Pl.'s 56.1, Ex. G at 12.)  When Duran was taken to the 20th Precinct, Villalba also took photographs of her purported injuries, although the quality of the pictures is too poor to determine if Duran was visibly injured.  (Defs.' 56.1 ¶ 33; *id.*, Ex. K.)  On the other hand, Glassman points out that Lincoln Center security guard Dejesus testified at Glassman's first criminal trial that he "didn't focus on the injuries because maybe [he] didn't see any injuries at the time."  (Pl.'s 56.1, Ex. B at 54.)  In addition, the report composed by Lincoln Center security guard Dalmaneras makes no mention of any visible injuries.  (Pl.'s 56.1, Ex. E.)

While police officers took Duran's statement, NYPD officers Ramon Guillen and Salvador Rosario went to Glassman's apartment.  (Defs.' 56.1 ¶ 31.)  Glassman voluntarily accompanied them to the precinct where Duran was being interviewed.  (Glassman Test. at 702.)  At some point while at the precinct, Glassman was arrested on the charge of assault in the third degree.  (Pl.'s 56.1, Ex. H.)  Later that day, he was also charged with one count of rape in the first degree.  (Defs.' 56.1, Ex. M.)

Two weeks after Glassman's arrest, Manhattan Criminal Court Judge Evelyn Laporte entered a temporary order of protection against him as a condition of bail.  (Defs.' 56.1, Ex. N.)  The order of protection directed Glassman to refrain from contacting Duran by any means and further ordered "no 3rd-party contact . . . ."  (*Id.*)  Despite this proscription, Glassman telephoned Duran's cousin on November 20, 2006 and allegedly threatened to have Duran deported.  (Defs.' 56.1 ¶ 37.)  Duran and her cousin reported this call to Officer Villalba, who inspected the cousin's phone and verified that a call between the cousin and Glassman had occurred, and also confirmed that an Order of Protection was outstanding.  (Pl.'s 56.1, Ex G at 32–34.)

Ten days later, Officer Villalba again arrested Glassman, this time charging him with criminal contempt.  (Pl.'s 56.1 ¶ 39.)  Four months after that, information produced by Glassman's telephone provider in response to a subpoena issued by the New York County District Attorney revealed that the call to Duran's cousin lasted a mere twelve seconds.  (Defs.' 56.1, Ex. P at 1, 3.)

4

Glassman was eventually indicted by a New York grand jury on one count of assault in the second degree, one count of rape in the third degree, and two counts of criminal contempt in the second degree. (Pl.'s 56.1, Ex. Q.)  Almost a full year later, after trial, a jury convicted Glassman on all counts except the assault charge. (Pl.'s 56.1 ¶ 40.)  However, the trial court set aside this verdict on the ground that Glassman had not had the opportunity to testify in his own defense. (*Id.* ¶ 41.)  Following a second trial—this time before a judge rather than a jury—Glassman was acquitted on all remaining charges on February 11, 2009, more than two years after he was first arrested. (*Id.* ¶ 42.)

### B. Procedural History

The Complaint in this action asserts two claims for relief for violations of 42 U.S.C. § 1983 against individual NYPD officers, the City of New York, and the New York County District Attorney's Office. (Compl. ¶¶ 35–46.)  Glassman also asserts seven New York state law causes of action against these defendants, in addition to Duran. (*Id.* ¶¶ 47–52.)  The District Attorney's Office and Duran have since been voluntarily dismissed from this action. (Dkt. Nos. 29, 31.)  Following discovery, the City and the individual officers have now filed this motion for summary judgment on Glassman's section 1983 claims.

## II. DISCUSSION

"Summary judgment may be granted only when the moving party demonstrates that there is no genuine issue as to any material fact and that . . . [he] is entitled to a judgment as a matter of law." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quotation marks omitted); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  On issues where the party opposing summary judgment would bear the burden of proof at trial, "the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact . . . ." *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  If the moving party succeeds in making a showing in either manner, "the nonmoving

party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex,* 477 U.S. at 322–23).

This Court may not weigh evidence or evaluate credibility when considering a summary judgment motion, *see Velez v. Sanchez*, 693 F.3d 308, 314 (2d Cir. 2012), and must "draw all reasonable inferences in favor of the non-moving party . . . ." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 144 (2d Cir. 1999). However, the court will "not permit an issue to go to trial on the basis of mere speculation in favor of the party that bears the burden of proof." *Id.*

### A.  Individual Liability Pursuant to 42 U.S.C. § 1983

Section 1983 provides that any "person" acting under color of law who deprives a citizen of rights secured by the Constitution "shall be liable to the party injured." Glassman argues that the individually named NYPD officers violated his constitutional rights in three ways: by falsely arresting him, maliciously prosecuting him, and failing to intervene and prevent either of these violations. The Court addresses each of these claims in turn.

#### 1.  *There Was No False Arrest Because There Was Probable Cause to Arrest Plaintiff*

"The elements of false arrest . . . under § 1983 are substantially the same as the elements under New York law." *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003) (quotation marks omitted). "Under New York state law, to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quotation marks omitted). A conclusion that an arrest was supported by probable cause entirely defeats a false arrest claim. *See Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010). This objective inquiry does not hinge on the offense the arresting officer believed was committed—an arrest is justified if there was probable

cause to arrest the plaintiff for any offense.  *See Marcavage v. City of N.Y.*, 689 F.3d 98, 109–10 (2d Cir. 2012).

"Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Boyd*, 336 F.3d at 75–76 (quotation marks omitted). A complaint by the purported victim of a crime will generally establish probable cause "unless the circumstances raise doubt as to the person's veracity."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  Further, "'[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'" *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

> a. *Probable Cause that Plaintiff Had Assaulted Duran Supported Plaintiff's First Arrest*

Glassman's first arrest, on October 31, 2006, arose out of his alleged assault of Duran.  Defendants are entitled to summary judgment on his claim that this arrest for assault violated his constitutional rights because the record conclusively establishes that the arresting officers had probable cause to arrest Glassman for third degree assault.

A person is guilty of assault in the third degree if he intentionally or recklessly causes physical injury to another person, or if he causes physical injury with criminal negligence "by means of a deadly weapon or a dangerous instrument."  N.Y. Penal Law § 120.00.  On the morning of October 31, 2006, Duran repeatedly told the Lincoln Center security guards and NYPD officers that Glassman had shoved her out of bed and slammed a door in her face.  Combined with the discolored lump on her forehead—testified to by the police officers—and her distraught demeanor, these facts gave the NYPD officers probable cause to believe that Glassman had caused Duran "physical injury" either intentionally or recklessly.  *See Curley*, 268 F.3d at 69; *Ricciuti*, 124 F.3d at 128; *Sforza v. City of N.Y.*, No. 07 Civ. 6122, 2009 WL 857496, at *14 (S.D.N.Y. Mar. 31, 2009);

*People v. Timberlake*, 300 A.D.2d 219, 220, 752 N.Y.S.2d 315, 316 (1st Dep't 2002).

Glassman attempts to rebut this conclusion in two ways. First, he asserts that there is a genuine issue as to whether Duran was visibly injured at the time of his arrest. Second, he argues that several facts the arresting officers knew or ought to have known raise legitimate doubts about Duran's veracity, depriving the officers of probable cause. Neither of these arguments passes muster.

Concerning Duran's injuries, three NYPD officers testified at Glassman's first criminal trial that they observed a large discolored lump on her forehead, which meshed with her account that Glassman had slammed a door in her face. One of these officers repeated his account at deposition, and plaintiff has not indicated that any of these witnesses has changed his sworn testimony. To counter this affirmative evidence, Glassman points to the testimony of one Lincoln Center security guard, who testified that he "didn't focus on the injuries because maybe [he] didn't see any injuries at the time," (Pl.'s 56.1, Ex. B at 54) and the fact that another security guard did not mention Duran's injuries in his written report. (Pl.'s 56.1, Ex. E.) Glassman thus attempts to manufacture an issue of fact from the uncertainty of one witness and the silence of another—but a party cannot rebut affirmative evidence with mere conjecture or speculation. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003).[3]

For his second argument, Glassman points to several facts that purportedly harmed Duran's credibility—specifically, the short length of

---

[3] Moreover, even if there were a genuine issue as to Duran's injuries, her statements and demeanor would have given the officers arguable probable cause to believe that Glassman had committed all of the elements of third-degree assault. *See Rodriguez v. N.Y. City Transit Auth.*, No. 06 Civ. 13762, 2009 WL 3817298, at *7 (S.D.N.Y. Nov. 10, 2009). This arguable probable cause would entitle the NYPD officers to qualified immunity. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 86–87 (2d Cir. 2007).

8

their marriage, the way he and Duran met, Duran's limited English, her immigration status and knowledge of the U Visa program, and her height and weight relative to him. These arguments border on the frivolous.

Glassman does not explain why the length of his marriage and the fact that he met Duran online should cause a reasonable officer to doubt her veracity, nor does he cite any authority to support this argument. There is no requirement that complaining witnesses communicate with law enforcement officers in English before the officers respond to a complaint. *See Timberlake*, 300 A.D.2d at 220, 752 N.Y.S.2d at 316. The arresting officers were also not required to determine Duran's immigration status before they credited her account. *Cf. Arizona v. United States*, 132 S. Ct. 2492, 2507–10 (2012) (suggesting that state statute requiring officers to make reasonable effort to determine suspect's immigration status could be applied unconstitutionally); *Santos v. Holder*, No. 10-2208-AG, 2012 WL 2579894, at *1 (2d Cir. July 5, 2012) (summary order) (officer's inquiry as to detainee's immigration status supported prima facie case for suppression of evidence derived from the detention). Glassman also offers no support for his suggestion that Duran's knowledge of the U Visa program decreased her credibility. Finally, as to the fact that Duran was both taller and heavier than Glassman, plaintiff offers no reason to suggest why he would be unable to shove Duran out of bed or lacked sufficient strength to use a door to assault her.

In sum, none of the inferences and innuendo Glassman relies on would have given a reasonable officer cause to doubt Duran's veracity. Given the totality of the facts known to the arresting officers, these defendants had probable cause—and at a minimum arguable probable cause—to arrest Glassman for assault in the third degree. Because the police had probable cause to arrest plaintiff for assault, this Court need not consider whether the arresting officers had probable cause to arrest Glassman for rape. *See Jaegly*, 439 F.3d at 154.

> b. *Probable Cause that Plaintiff Was in Criminal Contempt of a Court Order Supported Plaintiff's Second Arrest*

The second arrest, on November 30, 2006 for criminal contempt of the order of protection, stemmed from the telephone call between Glassman

and Duran's cousin, where Glassman allegedly threatened to have Duran deported.  "Under New York law, the crime of criminal contempt in the second degree requires that (1) a valid protective order existed, (2) the defendant knew about that order, and (3) the defendant intended to violate the order."  *Carthew v. Cty. of Suffolk*, 709 F. Supp. 2d 188, 198 (E.D.N.Y. 2010); *see* N.Y. Penal Law § 215.50(3).  In combination, the statement of Duran's cousin, the evidence that a telephone call had taken place between him and Glassman, and the fact that an order of protection was outstanding gave Officer Villalba probable cause to arrest Glassman for this crime.  *See Coyle v. Coyle*, 354 F. Supp. 2d 207, 212 (E.D.N.Y.), *aff'd*, 153 F. App'x 10 (2d Cir. 2005); *People v. Espinosa*, 46 A.D.3d 311, 312, 847 N.Y.S.2d 525, 526 (1st Dep't 2007).

Once probable cause to arrest existed, Officer Villalba "was 'not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'"  *Caldarola v. Calabrese*, 298 F.3d 156, 167–68 (2d Cir. 2002) (quoting *Ricciuti,* 124 F.3d at 128).  The fact that the call between Glassman and Duran's cousin lasted a mere twelve seconds could potentially undermine whether Glassman intended to violate the protective order.  However, this information came to light months after the arrest in response to a subpoena issued by the District Attorney.

In sum, the NYPD officers are entitled to summary judgment on both of Glassman's claims that he was falsely arrested.

> ### 2. *There Was No Malicious Prosecution Because Plaintiff Fails to Overcome the Presumption of Probable Cause Created by a Grand Jury Indictment*

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted).  Under New York law, "[m]alicious prosecution occurs when '(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4)

the matter terminated in plaintiff's favor.'" *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010) (quoting *Ricciuti*, 124 F.3d at 130).

As with false arrest, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003) (citing *Colon v. City of N.Y.*, 60 N.Y.2d 78, 83, 455 N.E.2d 1248, 1250–51 (1983)). But unlike a false arrest claim, if a prosecution goes forward based on a grand jury indictment, this "gives rise to a presumption that probable cause exists . . . in relation to the crimes described in the indictment . . . ." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006); *see also Boyd*, 336 F.3d at 76. This presumption can "*only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino*, 331 F.3d at 72 (emphasis in original) (quoting *Colon*, 60 N.Y.2d at 83, 468 N.Y.S.2d at 456).

Plaintiff offers two sets of facts that could prove the NYPD's bad faith—"the suspicious circumstances surrounding [Duran's] story" told to the NYPD and the fact that Glassman's telephone call to Duran's cousin lasted only twelve seconds. (Pl.'s Mem. in Opp'n at 7–8.) None of these facts is sufficient to overcome the presumption created by the grand jury indictment.

The Court has already dismissed most of the allegedly "suspicious circumstances" surrounding Duran's statements. Only one additional fact could possibly impeach Duran's account—that she delayed several weeks before reporting her alleged rape to the police. A delay in reporting a crime can cast doubt on the complaining victim's credibility. *See Cornett v. Brown*, No. 04-CV-0754, 2007 WL 2743485, at *6 (E.D.N.Y. Sept. 17, 2007), *aff'd sub nom. Cornett v. Jamison*, 326 F. App'x 624 (2d Cir. 2009); *Bullard v. City of N.Y.*, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003). However, in her written statement, Duran provided a "credible reason for [her] delay" in reporting this alleged crime, *Torino v. Rieppel*, No. 07-CV-1929, 2009 WL 3259429, at *6 (E.D.N.Y. Oct. 8, 2009), namely the numerous threats Glassman allegedly made if she "did anything" about his alleged mistreatment. (Pl.'s 56.1, Ex. P at 3.) These detailed threats would give a

reasonable officer a basis for believing Duran's statements despite her delay in reporting her alleged rape.

Concerning the brief duration of Glassman's call to Duran's cousin, this too could potentially undermine probable cause to prosecute Glassman for criminal contempt. "Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotation marks omitted). However, such intervening facts must be known to the defendants that plaintiff claims initiated his prosecution. *See Coleman v. City of N.Y.*, 177 F. Supp. 2d 151, 158 & n.5 (S.D.N.Y. 2001), *aff'd*, 49 F. App'x 342 (2d Cir. 2002). The record shows that the District Attorney had knowledge of the length of this call, but does not establish that any of the NYPD officers also knew the call was brief.[4]

Glassman has thus failed to overcome the presumption of probable cause created by the grand jury indictment. Because this failure alone defeats his malicious prosecution claim, this Court need not consider the other elements. *See Bonide Prods., Inc. v. Cahill*, 223 F.3d 141, 145 (2d Cir. 2000) (per curiam). But as set forth at length above, probable cause supported both of Glassman's arrests, and there is no evidence in this record either that probable cause later dissipated or that Officer Villalba commenced the prosecution, or altered the charges, with actual malice.

### 3.  *There Was No Failure to Intervene*

Glassman asserts a final theory of liability against the individual officers—that they failed to intervene as his constitutional rights were violated. "[L]aw enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence." *Curley*, 268 F.3d at 72. However, where the arresting and prosecuting officers committed no constitutional violation, a claim for failure to intervene will not lie. *See id.*;

---

[4]  The District Attorney's Office is no longer a defendant in this action.

*Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 406 (S.D.N.Y. 2009). The Court's conclusion that probable cause supported Glassman's arrests and prosecution is fatal to his failure to intervene claim for relief.

### B. There Is No Evidence to Support Municipal Liability Pursuant to 42 U.S.C. § 1983

In addition to his claims against the individual officers, Glassman also asserts that the City of New York is liable for his alleged constitutional violations pursuant to *Monell v. Department of Social Services*. A municipality such as the City of New York is a "person" that can be held liable pursuant to section 1983, but the City is not vicariously liable for the actions of its employees unless a municipal custom, policy, or usage was the moving force behind plaintiff's deprivation of constitutional rights. *See Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403–05 (1997); *Jones v. Town of E. Haven*, 691 F.3d 72, 80–81 (2d Cir. 2012).

A plaintiff may demonstrate the existence of a policy, custom, or usage in several discrete ways. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125–27 (2d Cir. 2004). Glassman relies on only one—the City's purported failure to train. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may" trigger *Monell* liability. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). To be held liable, the City's failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 131 S. Ct. at 1359 (alteration in original) (quoting *Canton*, 489 U.S. at 388). Thus, a plaintiff must prove that municipal policymakers were "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights," but nevertheless the city officials choose to retain that program. *Id.* at 1360.

Glassman specifically argues that the City inappropriately trained "its police officers to *accept at face value* all sexual assault claims" in "must-

13

arrest" situations.[5]  (Pl.'s Mem. in Opp'n at 13.)  Usually, plaintiffs rely on a "pattern of similar constitutional violations by untrained employees" to show deliberate indifference on the part of city policymakers.  *See Connick*, 131 S. Ct. at 1360.  Here, however, Glassman offers no evidence of any similar constitutional violations.  Nor does the record reflect any evidence that could support so-called "single-incident" liability.  *See Connick*, 131 S. Ct. at 1361; *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992).  In short, Glassman's claim against the City based on *Monell v. Department of Social Services* does not come close to the standard required to survive summary judgment.[6]

### C. The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's State Law Claims

Having dismissed all of Glassman's federal claims, this Court declines to exercise supplemental jurisdiction over plaintiff's state common law claims pursuant to 28 U.S.C. § 1367(c)(3).  *See Oneida Indian Nation of N.Y. v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011); *Doe v. Harrison*, 254 F. Supp. 2d 338, 345 (S.D.N.Y. 2003).

### III. CONCLUSION

Ronald Glassman has weathered literal trials and tribulations arising out of his short relationship with Duran.  The years it took him to be acquitted of all charges against him have no doubt taken their toll.  But

---

[5]  Pursuant to section 140.10(4) of New York's Criminal Procedure Law, a police officer "shall arrest" a husband whom the officer has "reasonable cause to believe" has committed either (1) a felony, other than grand larceny, against his wife, or (2) a specified misdemeanor, including assault in the third degree, against his wife, unless the wife requests otherwise or the officer "has reasonable cause to believe that more than one family or household member has committed such a misdemeanor." N.Y. Crim. Proc. Law § 140.10(4)(c).

[6]  Glassman also claims that he was subject to an unconstitutional strip search following his first arrest.  Even if Glassman was impermissibly strip searched, he fails to elaborate how his strip search was the product of any municipal policy, custom, or usage.

14

legal exoneration is only a part of what Glassman must show to succeed in his claims against the individual police officers and the City. The record presented to this Court conclusively demonstrates that the officers and the City were constitutionally justified in arresting and prosecuting Glassman, even if he was ultimately acquitted of the criminal charges against him.

Accordingly, defendants' motion for summary judgment in their favor on plaintiff's federal claims is granted with prejudice and plaintiff's state law claims are dismissed without prejudice.

Dated:   New York, New York
         January 3, 2013

SO ORDERED:

Sidney H. Stein, U.S.D.J.